UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **TYRONE JENKINS**, *et al.,*<br><br>    Plaintiffs,<br><br>v.<br><br>**DISTRICT OF COLUMBIA**,<br><br>    Defendant. | Civil Action No. 17-2730 (TSC) |

**MEMORANDUM OPINION**

Plaintiffs Tyrone Jenkins and Keith Allison are former correctional officers who have sued the District of Columbia, alleging retaliation against them in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII") and the DC Human Rights Act, D.C. Code §§ 2-1401-01 et seq. ("DCHRA"), and age discrimination in violation of the Age Discrimination in Employment Act Of 1967, 29 U.S.C. § 621, et. seq. ("ADEA") and the DCHRA. Sec. Am. Compl. ¶¶ 63-83, ECF No. 28. Defendant has moved for summary judgment. Mot. for Summ. J., ECF No. 42. For the following reasons, the court will **GRANT** in part and **DENY** in part Defendant's motion.

### I.  BACKGROUND

**A. Factual Background**

1. Jenkins

The D.C. Department of Corrections (DOC) hired Jenkins as a correctional officer in March 1985, and he worked there for over 30 years. *See* Def.'s Statement of Undisputed Material Facts ("SUMF") ¶ 1, ECF No. 42-1; Jenkins Dep. at 226:6, ECF No. 49-3. During his tenure, he served as an elected union official in roles such as treasurer and chief shop steward.

*See* Jenkins Dep. at 92:12-21; 115:1-6; 117:17-22.  Female officers often complained to Jenkins about sexual harassment.  *Id.* at 117:17-119:22.  As a result, he repeatedly raised issues regarding sexual harassment of female officers to his superiors and the union's executive committee.  *Id.* at 120:1-122:22.

For example, in October 2013, several female employees sued the DOC alleging sexual harassment by a DOC Major and others.  *Id.* at 171:9-12.  Jenkins "shepherd[ed] those 30 to 40 women through that process," by regularly meeting with the employees, representing them during meetings with the Equal Employment Opportunity (EEO) office, and contacting the Washington Lawyers Committee for Civil Rights and Urban Affairs on their behalf.  *See id.* at 169:21-171:15.  The female officers named Jenkins as a witness in their November 2013 complaint against the District, DOC Director Thomas Faust, and Joseph Pettiford (the accused Major) in *Brokenborough v. District of Columbia*, 13-cv-1757, in which Jenkins claimed that sexual harassment at the DOC was "rampant" and that he observed "male supervisors kiss, touch, hug, and grab female officers every day."  *Brokenborough* Compl. ¶¶ 179-81, ECF No. 49-4.  The DOC ultimately settled the case and demoted Pettiford.  *See* Jenkins Dep. at 225:9-226:1.

In March 2015, Jenkins represented a female correctional officer in a meeting with Warden William Smith.  *See* Decision and Order at 3, ECF No. 49-6.  During the meeting, Smith directed the female employee to unzip her sweater.  *See id.*  Jenkins objected and told Smith that the instruction was not a lawful order; Smith reprimanded Jenkins for his "inappropriate advice."  *See id.*

On March 30, 2015, Jenkins met with the EEO and labor relations office to report sexual harassment of female corrections officers.  *See* Jenkins Dep. at 187:5-188:9.  Jenkins claimed

Page **2** of **19**

that Smith transferred a female officer after she alleged a male coworker sexually harassed her, because Smith thought the male employee was "more valuable." *See id.* On April 2, 2015, Jenkins learned that Pettiford and Smith had instructed employees not to go to the union, and specifically Jenkins, with complaints of sexual harassment. *See id.* at 188:22-189:16. On the same day, Jenkins learned that certain DOC staff did not want him to represent employees during shift roll calls, *see id.* at 191:2-22, and Sergeant Hosea Green and Major Hargrave forcibly removed him from a roll call. S*ee id.* at 192:15-195:7. Jenkins received a write-up for insubordination for refusing to leave and interrupting the roll call, and was suspended for five days. *Id.* at 195:17-196:22.

On October 14, 2015, Jenkins was out on sick leave. *Id.* at 200:22-201:7. When he returned to work on October 15, a lieutenant informed him that he was barred from the DOC and denied him entry to the facility. *Id.* Jenkins attempted to return to work multiple times but was not permitted to enter the facility based on Major Pettiford's order. *Id.* at 201:10-22. DOC required Jenkins to use sick leave from October 25 until December 13, 2015, when he retired. *Id.* at 202:1-22; 206: 18-22; *see* SUMF ¶ 3 (Jenkins was required to retire from DOC under Title 5, United States Code, Section 8335(b) because he was 57 years old and had completed 20 years of creditable service). Jenkins's mandatory retirement did not reflect adversely on his "dedicated work performance." Jenkins Retirement Letter, ECF No. 49-18.

In July 2016, Jenkins became a basic corrections officer with Correctional Corporation of America ("CCA"). Jenkins Dep. at 206:18-207:14. At the time, D.C. used CCA as a vendor to manage the Correctional Treatment Facility ("CTF"). Townes Dep. at 11:2-11, ECF No. 49-29. The contract between D.C. and CCA ended on January 31, 2017. *Id.* at 15:12-16:16. Prior to the end of the contract, DOC prepared to transition CTF from CCA management to DOC

management.  *See id.* at 16:6-22.  As part of the transition planning, DOC developed a protocol for applications from CCA correctional officers who wanted to transition to employment with DOC.  *See id.* at 18:11-20:3; 20:12-21:17.

Later in July 2016, while employed with CCA, Jenkins applied to transition to DOC. Jenkins Dep. at 216:1-21.  Office of Investigative Services (OIS) Investigator Charles White conducted Jenkins's background check.  As part of that process, White contacted DOC Major Walter Coley by phone on August 8, 2016.  SUMF ¶ 15.  Coley supervised Jenkins from 1997 until Jenkins retired from DOC in December 2015.  *See* Walter Coley Deposition (2019) ("Coley Dep. 2019") at 42:1-9, ECF No. 42-8.  Coley told White that he would not rehire Jenkins because he had "issues with authority."  Jenkins Employment Questionnaire, ECF No. 42-9.

On August 9, 2016, White prepared a Disqualification Summary Report concluding that Jenkins should be disqualified for employment with DOC because he previously "displayed less than commendable dealings with his supervisors...demonstrated a pattern of insubordination, and a blatant disregard for the policies" of the DOC.  Jenkins Disqualification Summary Report, ECF No. 42-7.  On August 23, 2016, the DOC notified Jenkins that, as a result of his background investigation, he was not eligible for employment with DOC.  August 23, 2016 Letter to Jenkins, ECF No. 42-11.

On October 11, 2016, Jenkins filed a charge of discrimination with the DC Office of Human Rights (OHR) and the Equal Employment Opportunity Commission (EEOC) alleging retaliation in connection with DOC's failure to rehire him.  Jenkins EEOC Charge of Discrimination, ECF No. 42-12.  On November 16, 2017, the Department of Justice ("DOJ") issued Jenkins a right to sue notice.  Jenkins Right to Sue Letter, ECF No. 42-13.

2. Allison

The DOC hired Allison as a correctional officer in May 1989. Allison Dep. at 17:20-19:3, ECF No. 49-7. Allison served as a union shop steward between 2001 and 2015. *See id.* at 147:11-148:17. During his tenure at DOC, several female corrections officers approached Allison for assistance in addressing sexual harassment. *See id.* at 152:3-155:6. At least one of the women joined the *Brokenborough* lawsuit, which also named Allison as a witness. *See Brokenborough* Compl. ¶ 196. The Complaint included statements from Allison regarding DOC's inadequate sexual harassment training and failure to follow its rules and regulations regarding sexual harassment complaints. *Id.* ¶ 199. Allison also spoke with DOC's attorneys regarding the *Brokenborough* case. *See* Allison Dep. at 169:11-170:16.

On November 29, 2015, Allison was required to retire from DOC. SUMF ¶ 25. Allison's mandatory retirement did not reflect adversely on his "dedicated work performance." Allison Retirement Letter, ECF No. 49-17.

In February 2016, Allison applied to be rehired by DOC. Allison Dep. at 177:4-178:12. White was also assigned to conduct Allison's background check. On August 8, 2016, White spoke with Coley, who said that he did not recommend rehiring Allison because he had "issues with authority." White Dep. 2020 78:15-21, ECF No. 49-26; Allison Employment Questionnaire, ECF No. 42-20. On August 9, 2016, White prepared a Disqualification Summary Report concluding that Allison should be disqualified for employment with DOC because he previously "displayed less than commendable dealings with his supervisors...demonstrated a pattern of insubordination, and a blatant disregard for the policies" of the DOC. Allison Disqualification Summary Report, ECF No. 49-59. On August 17, 2016, DOC notified Allison that, as a result of his background investigation, he was not eligible for employment with DOC. August 17, 2016 Letter to Allison, ECF No. 42-21.

On November 1, 2016, Allison filed a charge of discrimination with the DCOHR and EEOC, alleging retaliation in connection with DOC's failure to rehire him. Allison EEOC Charge of Discrimination, ECF No. 42-22. Allison claimed there were 15 DOC employees who were mandatorily retired when he was, that he and another employee were the only mandatorily retired DOC employees to speak out against sexual harassment, and that he and the other employee were the only former employees who were not rehired. *See id.* On August 12, 2018, Allison received a probable cause finding from OHR. Letter of Determination Probable Cause Finding, ECF No. 42-23. On April 26, 2019, DOJ issued Allison a right to sue notice. Allison Right to Sue Letter, ECF No. 42-24.

### B. Procedural history

On December 20, 2017, Jenkins sued the District of Columbia and Quincy L. Booth, in his capacity as DOC Director, alleging retaliation in violation of Title VII and the DCHRA. Compl. ¶¶ 43, 48, ECF No. 1. The court granted Defendants' motion to dismiss Booth. 4/10/2018 Minute Entry. On June 18, 2019, Jenkins and Allison filed an amended complaint against the District of Columbia, also alleging retaliation in violation of Title VII and the DCHRA. Am. Compl. ¶¶ 60, 66, ECF No. 22. On November 4, 2019 Jenkins and Allison filed a second amended complaint, adding counts for age discrimination in violation of the ADEA and the DCHRA. Second Am. Compl. ("SAC") ¶¶ 74, 79, ECF No. 28.

## II. LEGAL STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). A court determines which facts are

"material" by looking at the substantive law on which each claim rests. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" is one whose resolution could establish an element of a claim or defense and therefore affect the outcome of the action. *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255. But the nonmoving party must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. Ultimately, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. A moving party may succeed on summary judgment by pointing to the absence of evidence proffered by the nonmoving party. *Id.*

The nonmoving party may defeat summary judgment if he "support[s] his allegations ... with facts in the record," *Greene v. Dalton*, 164 F.3d 671, 675 (D.C.Cir.1999) (quoting *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993)), or provides "direct testimonial evidence," *Arrington v. United States*, 473 F.3d 329, 338 (D.C. Cir. 2006). Anything less "would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial." *Greene*, 164 F.3d at 675.

### III. ANALYSIS

#### A. Plaintiffs' Age Discrimination Claims Under the ADEA

Defendant contends that Plaintiffs failed to exhaust their administrative remedies for their ADEA claims because neither raised age discrimination claims in their EEOC charges. "Before filing a lawsuit under the ADA, Title VII, or ADEA, a plaintiff must exhaust her administrative remedies by filing a charge of discrimination with the EEOC." *Cooper v. Henderson*, 174 F.

Supp. 3d 193, 202 (D.D.C. 2016) (citing 29 U.S.C. § 626(d)(1); 42 U.S.C. § 2000e–5(e)(1)). Moreover, "a lawsuit following an EEOC charge is limited in scope to claims that are 'like or reasonably related to the allegations of the charge and growing out of such allegations.'" *Klotzbach-Piper v. Nat'l R.R. Passenger Corp.*, 373 F. Supp. 3d 174, 183 (D.D.C. 2019) (citing *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) (internal citation omitted). "While the boxes [on the EEOC charge form] aid a claimant in identifying the nature of her charge, a claimant is not necessarily limited to the boxes she selected if she provides the basis for her claim in her written explanation." *Robinson–Reeder v. Am. Council on Educ.*, 532 F. Supp. 2d 6, 13 (D.D.C. 2008). "The administrative charge requirement serves the important purposes of giving the charged party notice of the claim and narrowing the issues for prompt adjudication and decision . . . the requirement of some specificity in a charge is not a mere technicality." *Park*, 71 F.3d at 907.

Here, both Plaintiffs checked the box on the EEOC charge form for retaliation; neither mentioned age discrimination in their EEOC charges and none of their EEOC allegations support age discrimination claims. In October 2016, Jenkins filed a charge "alleging disparate treatment, intimation, and retaliation for sexual harassment." Jenkins EEOC Charge of Discrimination at 1. Jenkins further alleged that DOC did not rehire him because of his "current OHR complaint and because as a Union Representative, [he] filed several complaints of sexual harassment on behalf of female employees against the [DOC]." *Id.* Similarly, Allison alleged in his November 2016 charge that DOC "failed to hire [him] based on [his] participation in a protected activity," such as testifying in a sexual harassment class action against DOC. Allison EEOC Charge of Discrimination at 1. Consequently, Plaintiffs' retaliation allegations cannot "reasonably be expected upon investigation" to lead to an age discrimination claim. *Park*, 71 F.3d at 909.

Plaintiffs have therefore failed to exhaust their administrative remedies for their ADEA age discrimination claims, and Defendant's motion as to those claims will be granted.

### B. Plaintiffs' Age Discrimination Claims Under the DCHRA

Defendant argues that Plaintiffs' age discrimination claims under the DCHRA are time-barred by the statute of limitations. Under the DCHRA, an employee must file a private cause of action against an employer "in a court of competent jurisdiction within one year of the unlawful discriminatory act, or the discovery thereof." *Ellis v. Georgetown Univ. Hosp.*, 631 F. Supp. 2d 71, 77 (D.D.C. 2009) (citing D.C. Code § 2–1403.16). When a discrimination charge is filed with the EEOC in the District of Columbia, a claim is automatically cross-filed with the DCOHR, pursuant to a "worksharing agreement" between the two agencies. 29 C.F.R. § 1601.13(a)(4)(ii)(A); *see Carter v. George Washington Univ.*, 387 F.3d 872, 879 (D.C. Cir. 2004). "The timely filing of a complaint with the [DCOHR] ... shall toll the running of the statute of limitations while the complaint is pending." D.C. Code § 2–1403.16(a); *see also Zelaya v. UNICCO Serv. Co.*, 587 F. Supp. 2d 277, 283 (D.D.C. 2008) (finding that the timely filing of a charge with the EEOC, and the automatic cross-filing of a claim with the DCOHR that follows tolls the one-year statute of limitations for a DCHRA claim); *Ibrahim v. Unisys Corp.*, 582 F. Supp. 2d 41, 45 (D.D.C. 2008) (same); *Ware v. Nicklin Assocs.*, Inc., 580 F. Supp. 2d 158, 164 (D.D.C. 2008) (same). Moreover, a claim is only tolled while it is pending before the EEOC/OHR, meaning that the claim in the charge must be the same or related to those in the complaint. *See Hammel v. Marsh USA Inc.*, 79 F. Supp. 3d 234, 239 (D.D.C. 2015).

In *Ellis*, the court permitted plaintiff's retaliation claim under the DCHRA because of the tolling provision and rejected defendant's argument that plaintiff could not "receive the benefit of tolling for a claim that she never raised in" her EEOC charge, because the allegations in her

EEOC charge, although not explicit, were sufficient to raise a retaliation claim. 631 F. Supp. 2d at 78.

Here, the alleged discriminatory act that serves as the basis for Plaintiffs' DCHRA age discrimination claim is DOC's refusal to rehire Plaintiffs after they mandatorily retired. SAC ¶¶ 81, 82. DOC notified Allison and Jenkins that it would not rehire them on August 17, 2016 and August 23, 2016 respectively, meaning they had until August 17, 2017 and August 23, 2017 to bring a civil action. *See* August 17, 2016 Letter to Allison; August 23, 2016 Letter to Jenkins. Plaintiffs' age discrimination claims were not tolled when they filed their EEOC charges because, as discussed above, neither charge alleged age discrimination. Jenkins filed suit in this court on December 20, 2017, after the one-year DCHRA statute of limitations had run, and Allison joined the suit on June 18, 2019. *See* Compl.; Am. Compl. Moreover, Plaintiffs did not bring their age discrimination claims under the DCHRA until they filed their Second Amended Complaint on November 4, 2019, approximately two years after the statute of limitations had run. *See* SAC. Consequently, Plaintiffs' age discrimination claims under the DCHRA are time barred and Defendant's motion as to those claims will be granted.

## C. Plaintiffs' Retaliation Claims Under Title VII and the DCHRA

Title VII and the DCHRA are similar and generally interpreted consistently, *see, e.g.*, *Craig v. District of Columbia*, 74 F. Supp. 3d 349, 368–69 (D.D.C. 2014) (citations omitted); *Elhusseini v. Compass Group USA, Inc.*, 578 F. Supp. 2d 6, 10 n.4 (D.D.C. 2008) (collecting cases). To state a claim for retaliation under Title VII or the DCHRA, a plaintiff "must establish three elements: [(1)] that she made a charge or opposed a[n unlawful] practice ..., [(2)] that the employer took a materially adverse action against her, and [(3)] that the employer took the action because of her protected conduct." *Allen v. Johnson*, 795 F.3d 34, 39 (D.C. Cir. 2015). The scope of adverse actions for Title VII retaliation claims is quite broad because Title VII's

"antiretaliation provision ... is not limited to discriminatory actions that affect the terms and conditions of employment*.*" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006) (citation omitted); *see also Siddique v. Macy's*, 923 F. Supp. 2d 97, 107 n.10 (D.D.C. 2013) (explaining that federal courts in this district apply *Burlington Northern* to DCHRA retaliation claims). A plaintiff must show that "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 68 (internal quotation marks omitted) (*citing Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).

The burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) governs retaliation claims under Title VII and the DCHRA. *See Gaujacq v. EDF, Inc.*, 601 F.3d 565, 576 (D.C. Cir. 2010). If the employer offers a "legitimate, nondiscriminatory reason for its action ... then the court 'need not—and should not—decide whether the [employee] actually made out a prima facie case under McDonnell Douglas.'" *Taylor v. Solis*, 571 F.3d 1313, 1320 n.* (D.C. Cir. 2009) (quoting *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008)); *see also Brady*, 520 F.3d at 494 ("[T]he prima facie case is a largely unnecessary side show."). Instead, "the court should proceed to the question of retaliation", *Taylor*, 571 F.3d at 1320 n.*, and "should resolve that question in the employer's favor if the employee is unable to prove an essential element of his case or if the employee is unable to rebut the employer's explanation." *Murphy v. D.C.*, 590 F. Supp. 3d 175, 190 (D.D.C. 2022)

1. <u>Allison's Retaliation Claims</u>

Defendant argues that Allison may not bring a DCHRA retaliation claim because he elected an administrative remedy.  *See* Mot. for Summ. J. at 9.  Plaintiffs did not respond to this argument in their opposition brief.

D.C. Code § 2-1403.16(a) provides: "Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of competent jurisdiction" unless the person first filed a complaint with OHR.  *See Brown v. Capitol Hill Club*, 425 A.2d 1309, 1311 (D.C. 1981) ("The jurisdiction of the court and OHR are mutually exclusive in the first instance.  Thus, where one opts to file with OHR, he or she generally may not also file a complaint in court.").  D.C. Code § 2-1403.16(a) authorizes a complainant to sue under the DCHRA after filing a complaint with OHR if: (1) OHR dismissed the complaint on the grounds of administrative convenience, or (2) the complainant withdrew the complaint before a probable-cause determination.  If OHR finds merit in the complaint, the complainant may not bring the claims in court.  *See Murphy*, 590 F. Supp. 3d at 191 (barring plaintiff from bringing DCHRA retaliation claim in court because he brought claim before DCOHR and the office issued a probable cause determination).

Here, it is undisputed that Allison brought his DCHRA retaliation claim before DCOHR, and that DCOHR issued a probable cause finding.  *See* Letter of Determination Probable Cause Finding, ECF No. 42-23.  Accordingly, Allison is barred from bringing his DCHRA retaliation claim in this court.

With regard to Allison's Title VII retaliation claim, there is no dispute that he "opposed an unlawful practice" when he was named as a witness in the *Brokenborough* sexual harassment lawsuit.  *See Allen*, 795 F.3d at 39; SUMF ¶ 24.  It is also undisputed that DOC "took a materially adverse action against" Allison when the Department decided not to rehire him.  *See*

*Allen*, 795 F.3d at 39; SUMF ¶ 34.  The issue for the court to determine is whether Allison has established a causal link between his protected activity and the adverse action.

Defendant argues that Allison failed to show that White, "who made the decision to find Plaintiffs not qualified for rehire, knew about their protected activity."  Mot. for Summ. J. at 19.  But Plaintiffs provided evidence that OIS Chief Wanda Patten, White's supervisor, assigned White to conduct Allison's investigation, and approved White's investigation report before notifying Human Resources that Allison was disqualified for employment with DOC.  *See* Patten Dep. at 12:1-10, 14:21-15:22, 24:1-7, ECF No. 49-22; SUMF ¶ 34.  The *Brokenborough* plaintiffs alleged that Patten interviewed at least two plaintiffs in connection with the sexual assault lawsuit, and therefore Patten would likely have known about Allison's protected activity.  *Brokenborough* Compl. ¶¶ 91, 175.  While the *Brokenborough* case was pending, Patten also met with Faust to discuss pending EEO complaints and how the District should respond.  *See* Opp'n Ex. 9, ECF 49-11.  A reasonable juror could conclude that Patten not only influenced White's investigation but ultimately decided to disqualify Allison for rehire based on her knowledge of his prior protected activity.  *See Singh v. Am. Ass'n of Retired Persons, Inc.*, 456 F. Supp. 3d 1, 11 (D.D.C. 2020) (concluding that a reasonable juror could find that a supervisor was involved in a subordinate's decision to terminate an employee in retaliation where the supervisor knew the employee engaged in protected activity, was heavily involved in the interview process, and discussed the termination decision with the subordinate).

Defendant also points to the length of time between Allison's protected activity and the decision not to rehire him.  Allison's protected activity occurred in 2013, and the DOC decided not to rehire him in August 2016.  SUMF ¶¶ 24, 32-34.  Ordinarily, this would undermine a plaintiff's attempts to show causation.  *See Hamilton v. Geithner*, 666 F.3d 1344, 1358 (D.C. Cir.

2012) (explaining that causation can be reasonably inferred when two events are "very close in time" (internal quotation marks and citation omitted); *See, e.g.*, *Payne v. District of Columbia Gov't*, 722 F.3d 345, 354 (D.C. Cir. 2013) ("Once the time between a protected disclosure and a negative employment action has stretched to two thirds of a year," there is no longer "temporal proximity" supporting a causal connection between the two events). But the lack of temporal proximity is not fatal to a plaintiff's claim if they provide other convincing evidence of causation. *See id.* For example, in *Singh*, the plaintiff accused her Travel Channel supervisor of pregnancy discrimination in 2014, left to work at AARP, and did not report to the same supervisor until 2018, when they both worked at AARP. 456 F. Supp. 3d 10-11. Had plaintiff worked for the same supervisor over the course of the four years, "the court would [have found] the lack of temporal proximity to be more concerning," but 2018 was "the first opportunity" plaintiff's supervisor had to retaliate against her, "so those four years [did] not undermine [her] retaliation claim." *Id.* at 12 (finding a reasonable juror could find that the employer's stated rationale for terminating plaintiff was a mere pretext for retaliation).

Here, Allison mandatorily retired from DOC in 2015, meaning he continued to work at DOC for 2 years after he engaged in protected activity. *See* SUMF ¶ 25. The *Brokenborough* case was pending during this time; in fact, the case was closed in June 2017. 13-cv-1757, ECF No. 135. As in *Singh*, a reasonable juror could find that DOC's "first opportunity" to retaliate against Allison was when he applied to be rehired in February 2016. 456 F. Supp. 3d at 12. Therefore, viewing the evidence in the light most favorable to Allison, the court concludes that he has established a prima facia case of retaliation.

Lastly, Defendant contends that Allison's Title VII retaliation claims fail because the DOC decided not to rehire Allison for legitimate, nondiscriminatory reasons—his personnel file

included unsatisfactory information and Major Coley gave him a negative employment reference. SUMF ¶¶ 29-32. Plaintiffs argue that these stated reasons are pretextual and offer sufficient evidence on which a jury could rely in support of Allison's retaliation theory. Allison's allegations against the DOC in the *Brokenborough* case were serious. *Murphy*, 590 F. Supp. 3d at 193 (finding that seriousness of a former employee's allegations in the *Brokenborough* lawsuit provided ample evidence for a jury to find that DOC leadership resented her). He claimed that employees lacked training regarding what constitutes harassment; approximately half of the women who approached him because they had suffered sexual harassment did not formally report it because they feared retaliation and termination; complaints fell on "deaf ears" or the women were moved to "rough" units (e.g., units where inmates exposed their genitals to officers); and DOC rarely imposed consequences on employees suspected of sexual harassment. *See Brokenborough* Compl. ¶¶ 196-99. The fact that the lawsuit was ongoing at the time DOC decided not to rehire Allison supports his theory of retaliation. Moreover, Allison received positive performance reviews in his last two years at DOC. In 2014, he received an overall rating of "Valued Performer" and his manager noted among other things that he "[t]reat[ed] all customers in a professional and courteous manner," "[d]emonstrat[ed] personal responsibility for ensuring the completion of work as prescribed," and "[e]xhibit[ed] an understanding and knowledge of the profession." Annual Performance Document – Allison 2014, ECF No. 49-65. In 2015, Allison received the highest possible overall rating of "Role Model" and his manager noted that he "[d]emonstrat[ed] consistent and continual adherence to all prescribed District customer service goals and standards." Annual Performance Document – Allison 2015, ECF No. 49-66. This counters Coley's claim that Allison had "issues with authority." *See* Allison Employment Questionnaire, ECF No. 42-20.

Plaintiffs also allege that DOC deviated from its internal policies and procedures when it conducted Allison's background check.  *See* Opp'n at 13.  Background investigators were required to keep notes during each background investigation in an Investigator Worksheet.  *See* White Dep. 2020 at 44:8-14, ECF No. 49-26; Hill Dep. at 25:9-26:7, ECF No. 49-23.  DOC policy mandated that before completing a background investigation and deeming an applicant disqualified, the investigator was required to present any negative information collected during the background investigation to the applicant and provide the applicant with the opportunity to explain.  *See* Joseph Hill Deposition 2019 ("Hill Dep. 2019") at 71:11-72:18, ECF No. 49-25.  But White did not take notes during Allison's background investigation and did not give Allison an opportunity to challenge the negative review he received from Coley.  *See* White Dep. 2020 at 145:3-14.  Plaintiffs have raised genuine questions of material fact as to whether DOC conducted Allison's background investigation in accordance with its standard policies and procedures.  Viewing the evidence in the light most favorable to Plaintiffs, it is at least plausible that DOC's background check of Allison did not conform to DOC's policies, which would provide additional evidence of pretext.  *See McIntyre v. Peters*, 460 F. Supp. 2d 125, 138 (D.D.C. 2006) ("[D]efendant's failure to follow its own policy ... when viewed in light of plaintiff's other evidence of pretext, raises a credibility question that is properly left to the jury."); *see also Murphy*, 590 F. Supp. 3d at 194 (finding an issue of material fact as to whether an employer's reason for terminating an employee was legitimate and nonretaliatory where employee's termination did not follow standard procedure).  Consequently, Allison's Title VII retaliation claim rests on genuinely disputed factual issues, and Plaintiffs may proceed to trial on it.

2. Jenkins's Retaliation Claims

Much of the court's reasoning in assessing Defendant's challenge to Allison's Title VII and DCHRA claims also apply to Jenkins's claims.  It is undisputed that Jenkins "opposed an

unlawful practice" when he brought sexual harassment complaints to Major Coley as a union representative in 2006, was named as a witness in the *Brokenborough* sexual harassment lawsuit in 2013, and reported sexual harassment to the EEO in March 2015. *See Allen*, 795 F.3d at 39; SUMF ¶ 2. It is also undisputed that DOC "took a materially adverse action against" Jenkins when the Department decided not to rehire him. *See Allen*, 795 F.3d at 39; SUMF ¶ 20. As with Allison, a reasonable juror could conclude that Patten influenced White's investigation into Jenkins and played a role in rejecting Jenkins for rehire. *See Singh*, 456 F. Supp. 3d at 11. Patten was White's supervisor, assigned White to conduct Jenkins's investigation, and approved White's investigation report, before notifying Human Resources that Jenkins was disqualified for employment with DOC. Patten Dep. at 12:1-10, 14:21-15:22, 24:1-7; SUMF ¶ 20. In Jenkins's case, the temporal connection between his protected activity and adverse activity is stronger than it is for Allison because he experienced repeated retaliation. Jenkins reported sexual harassment to the EEO in March 2015. *See* SUMF ¶ 20. On April 2, 2015, DOC staff prohibited him from acting as union representative during shift roll calls and forcibly removed him from a roll call. *See* Jenkins Dep. at 191:2-22; 192:15-195:7. DOC staff later wrote Jenkins up for insubordination because of the roll call incident and suspended him for five days. *Id.* at 195:17-196:22. In October 2015 DOC staff denied Jenkins entry to the facility and required him to use his sick leave until he mandatorily retired in December 2015. *Id.* at 201:1-22; 206: 18-22. This string of retaliatory events occurred within a period of less than nine months. The *Brokenborough* case was also pending during this period, which could cause a reasonable juror to find that DOC's decision not to rehire Jenkins in August 2016 was its "first opportunity" to retaliate against Jenkins after he retired. *Singh*, 456 F. Supp. 3d at 12. Viewing the evidence in

the light most favorable to Jenkins, the court concludes that he has established a prima facia case of retaliation.

Defendant contends that as with Allison, Jenkins's Title VII retaliation claims fail because the DOC decided not to rehire Jenkins for legitimate, nondiscriminatory reasons—his personnel file included unsatisfactory information and Coley gave him a negative employment reference. SUMF ¶¶ 15-18. Plaintiffs argue that these stated reasons are pretextual and offer sufficient evidence upon which a jury could rely in support of his retaliation theory. Jenkins engaged in multiple instances of protected activity between 1995 and 2015. SUMF ¶ 2. Moreover, Jenkins received positive performance reviews in his last two years at DOC. In 2014 and 2015, he received an overall rating of "Valued Performer" and his evaluations did not indicate that he had any issue with authority. *See* Annual Performance Document – Jenkins 2014, ECF No. 49-63; Annual Performance Document – Jenkins 2015, ECF No. 49-64. In fact, his manager noted that Jenkins "always provid[ed] quality customer service to staff, supervisor, and the public." Annual Performance Document – Jenkins 2014.

Plaintiffs also present evidence that DOC deviated from its internal policies and procedures when it conducted Jenkins's background check. *See* Opp'n at 13. As with Allison, White did not take notes during Jenkins's background investigation or give Jenkins an opportunity to challenge the negative review he received from Coley. *See* Jenkins Disqualification Summary Report. Again, this raises genuine questions of material fact as to whether DOC conducted Jenkins's background investigation in accordance with its standard policies and procedures. *See McIntyre*, 460 F. Supp. 2d at 138; *Murphy*, 590 F. Supp. 3d at 194. Consequently, the court concludes that Jenkins's Title VII retaliation claim rests on genuinely disputed factual issues, and Plaintiffs may proceed to trial on it.

## IV. CONCLUSION

For these reasons, the court will **GRANT** in part and **DENY** in part Defendant's motion. Specifically, the court will DISMISS Counts 3 and 4 as to both Plaintiffs and Count 2 as to Allison. That leaves Count 1 as to both Plaintiffs and Count 2 as to Jenkins. A corresponding Order will accompany this Memorandum Opinion.

Date: June 26, 2023

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge